UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Coastal Conservation League and South Carolina Wildlife Federation, | ) ) ) | Civil Action No.: 4:16-cv-03008-RBH |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ORDER DENYING PRELIMINARY INJUNCTION** |
| United States Army Corps of Engineers, Charleston District; Lt. General Todd T. Semonite, *in his official capacity as Chief of Engineers, U.S. Army Corps of Engineers*; Lt. Colonel Matthew Luzzatto, *in his official capacity as District Engineer, U.S. Army Corps of Engineers, Charleston District*; United States Environmental Protection Agency; Gina McCarty, *in her official capacity as Administrator of the U.S. Environmental Protection Agency*; Heather McTeer Toney, *in her official capacity as Regional Administrator, Region IV, U.S. Environmental Protection Agency*; and Horry County, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

This case concerns the construction of a road known as International Drive in Horry County,

South Carolina. Two public interest environmental organizations—the Coastal Conservation League

and the South Carolina Wildlife Federation (collectively, "Plaintiffs")—filed this action challenging

a permit issued by the United States Army Corps of Engineers ("the Corps") and seeking to enjoin

further construction work being done by Horry County at the site. The matter is presently before the

Court on Plaintiffs' Motion for Preliminary Injunction. *See* Pls.' Motion, ECF No. 6. The Court held

a hearing on October 28, 2016, and took the motion under advisement.[1] *See* ECF No. 46. Having

---

[1]      Plaintiffs and Horry County previously consented to the entry of a temporary restraining order ("TRO") limiting certain construction activities by the County. *See* ECF No. 23 (filed September 23, 2016). Plaintiffs subsequently filed a motion seeking to hold the County in contempt for allegedly violating the consent TRO. *See*

carefully reviewed Plaintiffs' motion, the parties' briefs and arguments, and the entire record, the Court denies Plaintiffs' motion.  In so ruling, the Court makes the following findings of fact and conclusions of law.

### Introduction

Plaintiffs have filed this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 through 706; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 through 4370h; and the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 through 1387.  *See* Complaint, ECF No. 1.  Plaintiffs challenge actions by the Corps authorizing impacts to approximately twenty-four acres of wetlands and waters of the United States in connection with the construction of International Drive in Horry County, South Carolina.  Specifically, Plaintiffs challenge various agency actions taken by the Corps, including: (1) the preparation of an environmental assessment ("EA") and the issuance of a finding of no significant impact ("FONSI") pursuant to NEPA, as well as the Corps' alleged failure to prepare a more detailed environmental impact statement ("EIS"); and (2) the issuance of a permit pursuant to Section 404 of the CWA ("the Section 404 permit").  *See* Compl. at 1-2.  Plaintiffs name as defendants the Corps, individual Corps engineers, the Environmental Protection Agency ("EPA") for its CWA oversight role, individual CWA administrators, and Horry County, the permit holder.  *Id.* at 1.  Plaintiffs seek a declaratory ruling that the Corps and EPA defendants (collectively, "the Federal Defendants") violated NEPA by failing to prepare an EIS and violated the CWA in issuing the Section 404 permit, and an injunction to prevent Horry County from working on the road until an EIS is

ECF No. 35 (filed October 6, 2016).  The Court heard the motion for contempt at the October 28 hearing, took it under advisement, and asked that Plaintiffs and the County try to reach an agreement in the meantime as to what additional construction activities the County could undertake consistent with the consent TRO.  Following the hearing, the Court received letters from counsel for Plaintiffs and counsel for the County indicating that the County agreed to protect five areas in the project right of way from further disturbance.  *See* ECF No. 49 (filed November 8, 2016).

prepared. *Id.* at 25-26. The Corps issued the permit, which authorizes the widening, realignment, and paving of a 5.6 mile portion of the existing dirt road known as International Drive. Plaintiffs have filed the instant motion for a preliminary injunction requesting that the Court enjoin any further construction activities on International Drive. *See* ECF No. 6.

The APA permits judicial review of claims challenging federal agency actions under the CWA and NEPA. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citing 5 U.S.C. § 702). NEPA requires federal agencies such as the Corps to analyze the environmental impact of their proposals so that the consequences of the action can be studied before the action is implemented and potential negative environmental impacts can be avoided. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989). "NEPA is a procedural statute; it does not force an agency to reach substantive, environment-friendly outcomes. Rather, NEPA simply requires that the agency take a 'hard look' at environmental impacts before taking major actions." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005). NEPA requires federal agencies "to the fullest extent possible" to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "An agency is not required to prepare a full EIS if it determines—based on a shorter environmental assessment (EA)—that the proposed action will not have a significant impact on the environment." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 16 (2008) (citing 40 C.F.R. §§ 1508.9(a), 1508.13). Under section 404 of the CWA, Horry County must obtain a permit from the Corps before it may fill wetlands in order to construct the roadbed for International Drive. *See* 33 U.S.C. § 1344.

**Background**

3

On November 26, 2013, Horry County submitted a Section 404 permit application[2] to the Charleston District of the Corps requesting authorization to impact approximately twenty-four acres of freshwater wetlands as part of a proposed project to realign, widen, and pave a 5.6 mile portion of International Drive. Administrative Record ("AR") at 119-286. Horry County's stated overall purpose for the road is to relieve current and anticipated traffic congestion and provide a secondary evacuation route. AR at 122.

In its present state, International Drive is a mostly unimproved dirt road approximately twenty to twenty-five feet wide. AR at 243. The proposed road construction consists of widening, paving, and realigning the existing unimproved portion of International Drive and making it a four-lane road. AR at 1360. The project site is approximately seven miles southeast of Conway and is bordered by S.C. Highway 90 to the north, private forested lands to the west, River Oaks Drive to the south, and the Lewis Ocean Bay Heritage Preserve ("LOBHP") to the east. AR at 243, 1502-04. Earlier, in June 2013, Horry County and the South Carolina Department of Natural Resources ("SCDNR") entered into a contract whereby the SCDNR conveyed Horry County a right-of-way easement for highway purposes over certain lands located within the LOBHP, an approximately 10,000 acre state heritage preserve held in public trust by the SCDNR that contains Carolina bays and forested uplands and wetlands inhabited by a variety of wildlife including the black bear, Venus flytrap, and federally endangered red-cockaded woodpecker.[3] AR at 623-40, 1431-33. The June 2013 contract contains certain conditions (which will

---

[2]    Horry County's permit application and other submissions to the Corps were prepared by the County's consultant/agent, The Brigman Company, Inc. *See* AR at 119.

[3]    The June 2013 contract modified the terms of an earlier agreement signed in 2010. *Compare* AR at 623-40 (2013 contract), *with* AR at 690-99 (2010 contract). The 2010 contract required Horry County to construct three wildlife passages under the roadway, along with special fencing to channel animals to and through the passages. AR at 692, 698-99. This requirement was eliminated in the 2013 contract. *See* AR at 628-29.

be discussed in detail below) for the protection and preservation of wildlife affected by construction of the road. *See, e.g.*, AR at 627-30.

On December 11, 2013, the Corps issued a public notice advertising Horry County's permit application. AR at 374-89. The EPA notified the Corps on January 15, 2014, that it would not be commenting on the public notice. AR 415-16. Other federal and state agencies, including the United States Fish and Wildlife Service ("USFWS"), the National Marine Fisheries Service ("NMFS"), and the SCDNR, as well as Plaintiffs and other public entities, submitted numerous comments on Horry County's application during various stages of the Corps' review of the application. *See, e.g.*, AR at 401-02, 410, 413-14, 417-26, 486-88, 498-500, 520-22, 681-703, 783-84, 889-90, 1142-48, 1150-53, 1276-77, 1364-76, 1398-1407, 1420-28. Through their comments, the agencies and the public expressed a variety of concerns including: habitat fragmentation of flora and fauna such as the black bear, red-cockaded woodpecker, and Venus flytrap, the lack of wildlife underpasses, traffic collisions between motorists and black bears, hydrologic effects, cumulative/secondary impacts and future development (particularly the existence of curb cuts), road size and speed limit (two lanes with a thirty-five-mile-per-hour speed limit versus four lanes with a forty-five-mile-per-hour speed limit), alternatives, and mitigation (including mitigation calculations and the location of the mitigation site). AR at 401-02, 414, 417-26, 486-88, 498-500, 681-703, 783-84, 1142-48, 1150-53.

During the application process, the Corps conducted site visits, inspected the wetlands, held meetings with the County, and requested the County to submit additional information addressing the comments received from the agencies and the public. *See, e.g.*, AR at 504-08, 704-82, 785, 1358-59, 1376, 1434-35. Through these requests, the Corps sought, *inter alia*, additional information regarding mitigation, avoidance and minimization of potential impacts to United States waters, and project

5

alternatives. *Id.* One issue of particular concern was Horry County's proposed compensatory mitigation plan advertised in the public notice, which called for "the enhancement and restoration of 93.4 acres of wetlands adjacent to the South Prong of Sterritt Swamp located in central Horry County just west of the proposed project and . . . proposed to generate 310.8 wetland mitigation credits." *See* AR at 128, 160-237, 374-75. After meeting with the Corps, Horry County withdrew this initial mitigation plan and submitted a revised mitigation plan that required the County to "enhance 121.54 acres of mature forested wetlands and interior drainageways associated with Conch Creek, Bass Lake, and the Pee Dee River to provide compensatory mitigation for the proposed improvements to International Drive" (collectively referred to as "Bass Lake Tract III").[4] AR at 536, 606-22. Besides providing the revised mitigation plan to the Corps, Horry County also provided detailed responses to the other concerns raised in the agencies' and the public's comments. *See, e.g.*, AR at 523-674, 786-816, 820-88, 919-46, 947-1084, 1379-98, 1407-20.

On July 15, 2016, the Corps issued an EA and FONSI concluding that the proposed road construction project did not constitute a major federal action significantly affecting the quality of the human environment, and therefore, did not require preparation of an EIS. AR at 1358-1490. In the EA, the Corps described the road construction project, noted the comments and responses received, discussed and addressed those comments and responses, analyzed the potential environmental impacts of the project, assessed potential alternatives, and approved Horry County's revised compensatory mitigation plan. *Id.*; *see generally* 40 C.F.R. § 1501.4 (setting forth the requirements of an environmental assessment). The 133-page EA certified the proposed site for discharge of dredged or

---

[4]     The Brigman Company, Inc. prepared the original mitigation plan, and Red Bay Environmental prepared the revised mitigation plan. *Compare* AR at 164, *with* AR at 610. Red Bay subsequently provided additional information regarding the revised mitigation plan. AR at 817-88.

fill material complied with the section 404(b)(1) guidelines of the CWA ("the 404(b)(1) Guidelines"). EA[5] at 129. On July 22, 2016, the Corps sent Horry County a signed Section 404 permit authorizing impacts to 24.19 acres of freshwater wetlands.[6] AR at 1496-1543. The Section 404 permit included conditions requiring Horry County to adhere to the mitigation plan and the 2013 contract with the SCDNR. AR at 1500. Plaintiffs filed this lawsuit on September 1, 2016,[7] and filed the instant motion for a preliminary injunction on September 14, 2016.[8] ECF Nos. 1 & 6.

### Preliminary Injunction Standard

Federal Rule of Civil Procedure 65 establishes the procedure for federal courts to grant preliminary injunctions. *See* Fed. R. Civ. P. 65. Because of the extraordinary nature of injunctive relief, the United States Supreme Court has admonished that preliminary injunctions "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

A plaintiff seeking a preliminary injunction must establish all four of the following criteria: (1) that the plaintiff is likely to succeed on the merits, (2) that the plaintiff is likely to suffer irreparable harm in the absence of preliminary injunctive relief, (3) that the balance of equities tips in the plaintiff's

---

[5]    The Environmental Assessment is located at pages 1358-1490 of the Administrative Record. The Court will cite it as "EA" followed by the original page number provided in the EA.

[6]    The total impact to 24.19 acres of wetlands is broken down as follows: filling of approximately 19.58 acres, mechanized land clearing of 0.26 acres, and excavation of 4.35 acres. EA at 4, 96. A total impact area of 19.48 acres is located within the LOBHP; the 19.48 acres consists of 7.07 acres of freshwater wetlands and 12.41 acres of uplands. EA at 96.

[7]    On July 7 and 26, 2016, the South Carolina Administrative Law Court ("ALC") issued orders upholding the South Carolina Department of Health and Environmental Control's certifications for the project pursuant to section 401 of the CWA and the South Carolina Coastal Zone Management Act, S.C. Code Ann. § 48-39-10, *et seq*. *See* AR at 1292-1353; Pls.' Mem. [ECF No. 6-1] at 7. Plaintiffs have appealed the state ALC's order to the South Carolina Court of Appeals. Pls.' Mem. at 7.

[8]    Plaintiffs subsequently filed a motion for a TRO on September 21, 2016. *See* ECF No. 16. As noted above, Plaintiffs and Horry County consented to the entry of a TRO limiting certain construction activities by the County. *See* ECF No. 23. Plaintiffs have filed a motion seeking to hold the County in contempt for allegedly violating the consent TRO. *See* ECF No. 35. The Court rules on the motion for contempt in a separate order.

favor, and (4) that the injunction is in the public interest. *League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citing *Winter*, 555 U.S. at 20). A plaintiff must make a *clear* showing that it is likely to succeed on the merits of its claim. *Winter*, 555 U.S. at 20-22. Likewise, a plaintiff must make a *clear* showing that it is likely to be irreparably harmed absent injunctive relief. *Id.* Only then may the court consider whether the balance of equities tips in the plaintiff's favor. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reissued in part*, 607 F.3d 355 (4th Cir. 2010), *overruling Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977). Finally, the court must pay particular regard to the public consequences of employing the extraordinary relief of injunction. *Id.* at 347.

## Summary of Arguments

Plaintiffs present several related arguments in support of their motion for a preliminary injunction. *See* Pls.' Mem. [ECF No. 6-1] at 5-6. They challenge the Corps' failure to prepare an EIS for the project, which Plaintiffs allege was a "'major Federal action significantly affecting the quality of the human environment'" within the meaning of NEPA and its implementing regulations. *Id.* at 5 (quoting 42 U.S.C. § 4332(C)). Additionally, Plaintiffs challenge the sufficiency of the EA that was prepared, asserting the EA is inadequate and fails to meet the NEPA requirement of taking a "hard look" at an action's environmental impact. *Id.* at 5, 12-22. Plaintiffs claim that the Corps failed to conduct an independent investigation into the purpose and need of the project, the environmental impacts of the project, and the existence of practicable alternatives; and that the Corps failed to support its conclusions with scientific studies and data as required by NEPA. *Id.* at 5-6, 13. Finally, Plaintiffs allege the Federal Defendants failed to comply with NEPA and failed to properly assess this project

under section 404(b) of the CWA, and that these alleged failures, conclusions, and decisions were arbitrary, capricious, and an abuse of discretion in violation of the APA. *Id.* at 6, 22-31. Plaintiffs maintain the Corps should not have issued the Section 404 permit at all because the project fails to meet the regulatory hurdles required for authorizing the filling of wetlands and for evaluating the existence of practicable alternatives. *Id.* Plaintiffs assert a preliminary injunction is warranted because they have a likelihood of succeeding on the merits, they will suffer irreparable harm without an injunction, the balance of the equities tips in their favor, and an injunction is in the public interest. *Id.* at 12-42. *See also* Pls.' Reply [ECF No. 44].

In response, the Federal Defendants maintain Plaintiffs have failed to carry their burden of showing that a preliminary injunction should be granted. *See* Fed. Defs.' Mem. [ECF No. 37] at 1. They argue Plaintiffs cannot meet their burden of demonstrating a likelihood of success on the merits because the Corps fully complied with NEPA, the CWA, and all applicable regulations, and because Plaintiffs cannot demonstrate the Corps acted arbitrarily or capriciously or abused its discretion under the APA. *Id.* at 1, 11-31. The Federal Defendants assert the Corps' 133-page EA analyzed the proposed permit in compliance with NEPA and section 404(b)(1) of the CWA. *Id.* They contend the Corps thoroughly considered the relevant environmental impacts, including the project's impacts on wetlands, wildlife, and the LOBHP, explained its conclusions, and reasonably determined the project was not likely to have significant impacts on the environment. *Id.* at 1-2, 11-18. Moreover, the Federal Defendants assert Plaintiffs cannot demonstrate an irreparable and imminent injury, the balance of equities favors the Corps, and an injunction is not in the public interest. *Id.* at 2, 31-36.

In its response, Horry County concurs with the Federal Defendants' arguments regarding the lack of Plaintiffs' likelihood of success on the merits. *See* Horry Cty.'s Mem. [ECF No. 41] at 11. The

County further maintains that allowing the project to be completed will not likely result in irreparable harm. *Id.* at 11-17. Additionally, the County asserts the equities tip in its favor because it will suffer both financial (e.g. construction costs and delays) and non-monetary (e.g. public safety risks and traffic congestion) harm if completion of the road is enjoined. *Id.* at 17-19. Last, the County argues construction of International Drive is in the public interest of its citizens, who are funding the road and need it for various purposes such as evacuation, emergency services, and traffic congestion relief. *Id.* at 17, 19-21.

## Discussion

### I.    Applicable Law

### A.    Administrative Procedures Act

Both NEPA and CWA claims are subject to judicial review under the APA. *Aracoma Coal*, 556 F.3d at 189 (citing 5 U.S.C. § 706). The APA provides that a reviewing court is bound to "hold unlawful and set aside agency action" for certain specified reasons, including whenever the challenged act is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Ohio Valley Envtl. Coal., Inc. v. United States Army Corps of Engineers*, 828 F.3d 316, 321 (4th Cir. 2016). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Aracoma Coal*, 556 F.3d at 192. The Court's "inquiry must be searching and careful, but the ultimate standard of review is a narrow one. Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." *Ohio Valley*, 828 F.3d at 321 (internal quotation marks and citations omitted).

An agency decision is arbitrary and capricious "if the agency relied on factors that Congress has

10

not intended it to consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so implausible that

it could not be ascribed to a difference in view or the product of agency expertise." *Hughes River*

*Watershed Conservancy v. Johnson*, 165 F.3d 283, 287-88 (4th Cir. 1999).

> In determining whether agency action was arbitrary or capricious, the court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. ***The court is not empowered to substitute its judgment for that of the agency. Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made.***
>
> The arbitrary and capricious standard is not meant to reduce judicial review to a rubber-stamp of agency action. While the standard of review is narrow, the court must nonetheless engage in a searching and careful inquiry of the record. But, this scrutiny of the record is meant primarily to educate the court so that it can understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made.

*Aracoma Coal*, 556 F.3d at 192-93 (emphasis added) (internal quotation marks and citations omitted).

Generally, in reviewing an agency decision under the APA, a district court's "review is to be

based on the full administrative record that was before the [agency head] at the time he made his

decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *see Fishermen's*

*Dock Co-op., Inc. v. Brown*, 75 F.3d 164, 167-68 (4th Cir. 1996).

**B.    National Environmental Policy Act**

NEPA "sets forth a regulatory scheme for major federal actions that may significantly affect the

natural environment." *Nat'l Audubon*, 422 F.3d at 184. It "promote[s] efforts which will prevent or

11

eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. "NEPA's environmental-review requirements are procedural, not substantive. Thus, 'even agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs.'" *Ohio Valley*, 828 F.3d at 320 (quoting *Aracoma Coal*, 556 F.3d at 191). NEPA's procedural mandates "ensure that an agency planning a major federal action obtains and considers the necessary information concerning any significant environmental impacts that the action may cause," and "[t]hey also guarantee that the public has access to the relevant information about the proposed action so that it can participate in the decisionmaking process." *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 417 (4th Cir. 2012).

When reviewing an agency's efforts to comply with NEPA, a court must perform a two-step analysis. *Hodges v. Abraham*, 300 F.3d 432, 445 (4th Cir. 2002). First, the court must determine whether the agency took a "hard look" at a proposed project's environmental impacts before acting. *Id.* "A 'hard look' is necessarily contextual," and a court "must take a holistic view of what the agency has done to assess environmental impact." *Nat'l Audubon*, 422 F.3d at 186 ("[C]ourts may not 'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor."). "[A]n agency takes a sufficient 'hard look' when it obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are raised." *Hughes River*, 165 F.3d at 288. While an agency should consider other agencies' comments, it need not defer to them when it disagrees and is entitled to rely on the view of its own experts. *Id.* "As long as the adverse environmental effects of a proposed action are sufficiently identified and evaluated, an agency is vested with discretion to determine under NEPA that other values outweigh the environmental costs." *Id.*

12

Second, if the court is satisfied that the agency took the required "hard look," it must then consider whether the agency's conclusions are arbitrary or capricious. *Hodges*, 300 F.3d at 445. Thus, in conducting a NEPA inquiry, the Court must "make a searching and careful inquiry into the facts and review whether the decision [of the agency at the time it was made] was based on consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (alteration in original). "If the agency has followed the proper procedures, and if there is a rational basis for its decision, [the Court] will not disturb its judgment." *Id.*

NEPA created the Council of Environmental Quality ("CEQ") within the Executive Office of the President, granting it authority to issue regulations effectuating NEPA. *See* 40 C.F.R. § 1500 *et seq.* (CEQ regulations). CEQ regulations are mandatory for all federal agencies, carry the force of law, and are entitled to substantial deference. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 372 (1989); *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979). In addition to the CEQ regulations, agencies are bound by whatever regulations they promulgate under NEPA. *See, e.g.*, 33 C.F.R. § 230 *et seq.* (the Corps' regulations for implementation of the procedural provisions of NEPA).

NEPA requires a federal agency to prepare an EIS before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).[9] To comply, an

---

[9] In full, NEPA provides:

> [A]ll agencies of the Federal Government shall . . . include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

agency must first decide whether a contemplated project qualifies as a "major Federal action significantly affecting the quality of the human environment." *See id.* CEQ regulations instruct the agency to consider both the "context" and "intensity" of the action to determine if its environmental effects will be "significant."[10] 40 C.F.R. § 1508.27(a)-(b).

To determine whether an action will have a significant environmental impact and thus require

---

42 U.S.C. § 4332(C). This "detailed statement" is an EIS. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004).

[10]     Context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of impact" and requires consideration of the following ten factors:

(1)     Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2)     The degree to which the proposed action affects public health or safety.
(3)     Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4)     The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(5)     The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
(6)     The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
(7)     Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
(8)     The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.
(9)     The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.
(10)    Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b). *See also Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581, 589-90 (4th Cir. 2012) (discussing the context and intensity criteria).

14

an EIS, an agency first decides whether the action is one that normally does require an EIS, or is categorically excluded from requiring an EIS. 40 C.F.R. § 1501.4(a). If the agency cannot readily determine whether an action will significantly affect the environment, then it must prepare an EA that discusses the proposed action, alternatives, and the environmental impacts of the proposed action and its alternatives. 40 C.F.R. §§ 1501.4, 1508.9. An EA is a "concise public document" that "provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9(a). The EA must "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E),[11] of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). If the EA reveals that the project will have a significant effect on the quality of the human environment, then the Corps must prepare a detailed, written EIS. *See* 42 U.S.C § 4332(2)(C). If the Corps determines that its proposed action will not have a significant effect on the environment, then it need not prepare an EIS but may instead issue a FONSI. 40 C.F.R. § 1508.13. A FONSI "briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Pub. Citizen*, 541 U.S. at 757-58 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

     "[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Id.* at 767 (citing *Marsh*, 490 U.S. at 373-74). "Where the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency to prepare an EIS." *Id.*

---

[11]     Section 102(2)(E), which is codified at 42 U.S.C. § 4332(2)(E), requires an agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

15

"An agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 763 (quoting 5 U.S.C. § 706(2)(A)).  Whether issuing an EA or an EIS, the agency's hard look must "encompass[] a thorough investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail." *Nat'l Audubon*, 422 F.3d at 185.  "Mere conclusions, unsupported by evidence or analysis, that the proposed action will not have a significant effect on the environment will not suffice to comply with NEPA." *Friends of Congaree Swamp v. Fed. Highway Admin.*, 786 F. Supp. 2d 1054, 1062-63 (D.S.C. 2011).  However, if the agency has given the question the requisite hard look, its "determination that a project will not significantly impact the environment is entitled to *substantial deference*." *Shenandoah Ecosystems Def. Grp. v. U.S. Forest Serv.*, 194 F.3d 1305, 1999 WL 760226, at *7 (4th Cir. 1999) (unpublished table decision) (emphasis added).

### C.     Clean Water Act

The purpose of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The CWA prohibits the discharge of pollutants (such as dredged or fill material) into navigable waters—including wetlands—of the United States without a permit from the Corps. *See* 33 U.S.C. §§ 1311(a), 1344, 1362(7); 33 C.F.R. § 328.3. *See also S.C. Coastal Conservation League v. U.S. Army Corps of Engineers*, 789 F.3d 475, 478 (4th Cir. 2015) ("[T]he Clean Water Act (CWA), 33 U.S.C. §§ 1251 through 1387, authorizes the Corps, with oversight by the United States Environmental Protection Agency (EPA), *id.* § 1344(c), to issue permits for the discharge of fill material into the waters of the United States, *id.* § 1344(a).").  Section 404 of the CWA authorizes the Secretary of the Army, acting through the Corps, to regulate discharges of dredged and

16

fill material into wetlands through the issuance of permits. *See* 33 U.S.C. § 1344. In issuing permits, the Corps follows guidelines promulgated by the EPA under section 404(b)(1) of the CWA and incorporated by the Corps into its own regulations. *See id.* § 1344(b)(1); 40 C.F.R. pt. 230; 33 C.F.R. § 320.2(f). These guidelines prohibit discharges that "will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). A discharge contributes to significant degradation if it has "[s]ignificantly adverse effects" on human health or welfare, on special aquatic sites,[12] aquatic life, and other wildlife dependent on aquatic ecosystems, on aquatic ecosystem diversity, productivity, and stability, or on recreational, aesthetic, and economic values. *Id.*

Before the Corps may issue a Section 404 permit, it must determine there is no "practicable alternative" to the proposed activity "which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). A practicable alternative is one that "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). When a project "is not 'water dependent,'" a presumption arises that there are "practicable alternatives [available] that do not involve special aquatic sites" and that "have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3). A Section 404 applicant (e.g. Horry County) *must rebut this presumption* if an alternative involving the destruction of U.S. waters is chosen. *Id.*; Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85,336, 85,339 (Dec. 24, 1980).

## II.    Analysis

The Court will conduct its analysis by applying the four factors for a preliminary injunction set

---

[12]    Special aquatic sites "are geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values." 40 C.F.R. § 230.3(m). Wetlands are classified as special aquatic sites. *Id.* § 230.41.

forth in *Winter*, *supra*. The Court's primary focus is on the first *Winter* factor: Plaintiffs' likelihood of success on the merits.

A.    **Likelihood of Success on the Merits**[13]

1.    **The Corps Took a Hard Look Under NEPA; and the Corps' Preparation of an EA and Issuance of a FONSI and Its Decision Not to Prepare an EIS Was Not Arbitrary, Capricious, or an Abuse of Discretion**

Plaintiffs first argue the Corps failed to take a hard look at the environmental impacts associated with the construction of International Drive. Pls.' Mem. at 12-22. Specifically, they contend the Corps failed to conduct any independent analysis regarding the purpose and need for the project, the environmental impacts of the project, or the existence of alternatives. *Id.* at 13. Plaintiffs challenge the Corps' decision to prepare only an EA, and they assert the Corps should have prepared an EIS because the paving of International Drive and the resulting loss of twenty-four acres of wetlands (and property in the LOBHP) is a major federal action significantly affecting the quality of the human environment. *Id.* Plaintiffs further challenge the adequacy of the EA, claiming that it consists of mere conclusory statements and a regurgitation of various comments and responses received by the Corps and that it lacks support by way of independent scientific analysis, underlying data, expert agency comments, or reference to any quantified or detailed information. *Id.* at 15-19. Plaintiffs maintain, "The entire decision document is plagued by . . . unsupported conclusory statements found to be inadequate and insufficient to meet NEPA's 'hard look' requirement." *Id.* at 19.

An overarching theme throughout Plaintiffs' brief is their argument that the Corps failed to

---

[13]    In analyzing Plaintiffs' likelihood to succeed on the merits, the Court is simply applying the first *Winter* factor and analyzing whether Plaintiffs are entitled to preliminary injunctive relief.

undertake an independent investigation and erred in relying on Horry County's submissions. *See, e.g.*, *id.* at 8, 18-20, 23, 28-30. The Corps, however, is permitted to rely on information, studies, and other submissions provided by permit applicants and consultants so long as such submissions are credible and critically evaluated by the Corps. *See Hoosier Envtl. Council v. U.S. Army Corps of Engineers*, 722 F.3d 1053, 1061 (7th Cir. 2013); *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1170-71 (10th Cir. 2012); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1270 (10th Cir. 2004); *Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986); *Friends of the Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir. 1986). Thus, to the extent Plaintiffs take issue with the Corps' reliance on Horry County's submissions, the Court need not further consider this argument.

As for the substantive environmental analysis in the EA, the Court finds the Corps' conclusions and statements are supported by the evidence in the record. The 133-page EA indicates the Corps independently reviewed multiple scientific studies, including a functional assessment of the wetlands done by both the Corps and the County's consultant, a biological assessment for the federally endangered red-cockaded woodpecker, and a Grand Strand Area Transportation Study. EA at 74-75, 77-78, 108-09. The EA indicates that the Corps considered the project's environmental impacts on both wetlands and wildlife including the woodpecker, coastal black bear, and Venus flytrap, and that the Corps analyzed eleven proposed alternatives (as well as a no action alternative) and reasonably concluded none were practicable (as discussed in more detail in the next section of this Order). EA at 1-2, 74-76, 84-92, 96-97. Significantly, the EA specifies the Corps relied upon its *own site visits to the wetlands and onsite inspection of each wetland* and reviewed a functional assessment of the existing conditions of the impacted wetlands *in accordance with the Corps' own Charleston District standard*

19

*operating procedures* ("SOP") for mitigation purposes.[14]  EA at 1-2, 74, 78.  The Corps acknowledged that "[t]he discharge of dredged or fill material in wetlands for this project will directly impact approximately 24.19 acres of habitat and adversely affect the biological productivity of the underlying wetland ecosystem,"[15] and that "[t]he impact to over 24 acres of wetlands is recognized to be significant when considering acreage alone." EA at 96-97.  However, the Corps explained that "when viewing the larger geographical area in which the impacts are proposed, the wetlands are a portion of a vast, interconnected system," and concluded that "although there are impacts to a large amount of wetlands, the impacts are not considered significant."  EA at 97.  In reaching this conclusion, the Court paid

---

[14]    To the extent Plaintiffs contend the Corps did not independently analyze these wetlands, that contention is not supported by the record.  The EA specifies the Corps independently visited and inspected each wetland and made an independent determination of their functionality in accordance with the Corps' own SOP:

> The Corps initially determined that the existing conditions of wetlands 1 through 23 were considered fully functional and the remaining wetlands onsite were determined to be partially impaired based on review of 2006 and 2012 aerial photography.  *A site visit was performed by the Corps on January 30, 2015, to evaluate the existing condition of the proposed impact areas used for calculating the required compensatory mitigation.*  The applicant's agent performed a functional assessment of the impact areas during April 2014, which was submitted to the Corps in the applicant's response dated December 18, 2014.  **The Corps met onsite with the applicant's agent to review their findings of individual wetland impact areas.  During this onsite inspection each wetland was reviewed onsite and assigned an existing condition of either** *Fully functional*, *Partially impaired*, **or** *Impaired* **based on the definitions of each classification outlined in the Charleston District Mitigation SOP.**  The Corps' findings and determinations are documented in Section 1.3 of this document [EA at 1-2].  *In response to the site visit of January 30, 2015, and the Corps' determination of the existing conditions, the applicant submitted revised mitigation calculation sheets that accurately reflect the existing conditions* **as determined by the Corps**; *therefore, the Corps has determined that this concern has been addressed and the calculations adhere to the methodology outlined [in] the Charleston District Mitigation SOP.*

EA at 78 (emphases added); *see also* EA at 1-2 (Section 1.3 containing the Corps' findings and determinations regarding functionality of each wetland).  **The Corps documented its January 30, 2015 visit with dozens of photographs of the wetlands.**  AR at 704-82.

[15]    The Corps specified, "Potential impacts of the fill may result in smothering, or altering substrate elevation or periodicity of water movement.  The addition of fill material will destroy wetland vegetation or result in advancement of succession to dry land species, specifically on the road shoulders."  EA at 97.

particular attention to the fact that "the impacts located within the project area are to wetlands that are mostly considered impaired with limited function (approximately 2/3 has [*sic*] been identified as impaired)."  EA at 97.

Moreover, the Corps engaged in a lengthy discussion of the compensatory mitigation for the environmental impact of the project.  EA at 77-84, 112-27; *see generally* 33 C.F.R. pt. 332 (compensatory mitigation standards and criteria jointly developed by the EPA and the Corps); 40 C.F.R. §§ 230.91-98 (same).  The Corps determined, based upon its own onsite functional assessment of each wetland, that two-thirds of the approximately twenty-four acres were either "impaired" or "partially impaired" in accordance with the Charleston District Mitigation SOP.  EA at 1-2, 78-80.  The Corps noted various agencies and public entities (including the USFWS, SCDNR, NMFS, the Coastal Conservation League, and the South Carolina Environmental Law Project), as well as the Corps itself, expressed concerns with Horry County's initial proposed mitigation plan, noting the initial plan "lacked adequate baseline data to support the applicant's proposal that enhancement/restoration to hydrology would occur throughout the site as proposed."  EA at 77.  After several site visits and meetings with the Corps, the County withdrew its initial compensatory mitigation plan and submitted—after the Corps forwarded the concerns to the County—a revised mitigation plan, which the Corps ultimately approved and found "adequately compensated for impacts to aquatic resources."  EA at 77, 80, 113-26.  The Corps conducted an onsite meeting with Horry County's mitigation agent on January 30, 2015, and inspected each wetland to be impacted by the construction project.  EA at 1-2, 78.  The Corps concluded the County's revised mitigation calculation "adhere[d] to the methodology outlined [in] the Charleston District Mitigation SOP."  EA at 78.  The EA details Horry County's revised mitigation plan, which requires the County to complete the mitigation at Bass Lake Tract III.  EA at 113-26; *see AR* at 817-88

(mitigation plan). Significantly, the Section 404 permit requires the County to adhere to and complete the compensatory mitigation plan. AR at 1500.

Furthermore, the EA contains a review and discussion of the potential impact on wildlife within the LOBHP. EA at 74-77, 94-96; *see generally* 40 C.F.R. § 1508.27(b)(3) (an intensity factor requiring consideration of "[u]nique characteristics of the geographic area such as proximity to . . . wetlands . . . or ecologically critical areas"). First, per the recommendation of the USFWS, Horry County obtained a biological assessment for the federally endangered red-cockaded woodpecker and submitted it to the USFWS for review. EA at 74-75; *see* AR at 509-19 (biological assessment). The USFWS ultimately sent the Corps a letter concurring with the Corps' determination that the road construction project was not likely to adversely affect resources under the USFWS's jurisdiction and protected by the Endangered Species Act (including the woodpecker in question). AR at 521-22.

Second, the Corps relied on the existence of the 2013 contract between Horry County and the SCDNR. EA at 75-76; AR at 623-40 (2013 contract). The Corps noted this contract contains measures addressing potential impacts to wildlife overseen by the SCDNR and located on the LOBHP. EA at 75-76, 96. Specifically, the contract: (1) recognizes LOBHP is home to the red-cockaded woodpecker and requires Horry County to consult with the USFWS and ensure compliance with the Endangered Species Act; (2) prescribes periodic burning to ensure habitat survival of "the flora and fauna at LOBHP" including the woodpecker and Venus flytrap; (3) requires the County to construct and maintain fences along both sides of the road to impede black bears from entering the highway; and (4) restricts the speed limit of International Drive to a maximum of forty-five miles per hour. AR at 627-29. Regarding the LOBHP, the Corps noted the conditions required of Horry County in the 2013 contract mitigated any impacts that the project may have on the LOBHP. EA at 96, 99. Specifically, the Corps found

22

> With the SCDNR Contract signed by Horry County (applicant), and SCDNR (LOBHP Manager) any impacts that the project may impose on LOBHP have been mitigated for by the included conditions within the signed SCDNR Contract. Therefore, the proposed discharge will have an impact on the LOBHP; however, the impacts will not be significant.

EA at 96. The Corps stated in the EA *that Horry County's compliance with the 2013 contract would be a special condition of the Section 404 permit*; and the Section 404 permit does in fact require Horry County to adhere to its contract with the SCDNR and coordinate with the Corps for "[a]ny future amendments to the SCDNR contract." EA at 76; AR at 1500 (Section 404 permit). Thus, the Corps addressed the potential environmental impacts on wildlife protected under federal law and wildlife under the jurisdiction of the SCDNR, a state wildlife agency that agreed to grant Horry County a right-of-way easement for highway purposes in the LOBHP that is held in trust by the SCDNR. The Corps acted reasonably in recognizing the SCDNR is the agency that manages the LOBHP and is best suited to make the appropriate decisions regarding the protection of wildlife. *See* EA at 76, 96. Importantly, the Corps is able to police Horry County's compliance with both the 2013 contract and the mitigation plan because such compliance is a mandatory condition of the Section 404 permit. AR at 1500; *see* 33 C.F.R. § 325.4 (permitting the Corps' district engineer to add special conditions to permits); *Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581, 589 (4th Cir. 2012) ("Measures designed to render minimal a particular action's impact upon the environment, whether proposed in mitigation or assumed to already exist, are more readily deemed efficacious (and thus more comfortably within an agency's broad prerogative to propose or assume) when they are likely to be policed. *Such policing may occur prospectively by administrative enforcement through the imposition of a mandatory permit condition . . . ."* (internal citation and quotation marks omitted) (emphasis added)).

23

Regarding Plaintiffs' criticism of the Corps' reprinting of the comments received and Horry County's responses to the comments, such criticism is misplaced when the EA is considered as a whole. The reprinting of the comments and responses actually supports a finding that the Corps took a sufficient hard look at the environmental impact of the project. *See Hughes River*, 165 F.3d at 288-89 (stating "an agency takes a sufficient 'hard look' when it obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are raised"; and "conclud[ing] that the Agencies took a sufficient 'hard look' at the issue" because "[t]he record reflects that the Agencies carefully considered and responded to these comments"). While the comments and responses appear verbatim at the beginning of the EA, they are followed by the Corps' own substantive discussion of the issues presented in those comments and responses. EA at 7-92, 103-12, 114. The Corps complied with the requirements of NEPA by quoting the comments/responses and addressing them in substantial detail. *See, e.g.*, *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 63 (4th Cir. 1991) (finding the Corps complied with NEPA because it adequately considered comments received).

In their motion, Plaintiffs raised a general argument regarding the Corps' alleged failure to consider environmental concerns identified by the Corps' sister agencies, the USFWS and the NMFS.[16]

---

[16]     Plaintiffs also cite concerns that the USFWS expressed in a letter dated February 11, 2014. Pls.' Mem. at 18-19, 29; *see* AR at 486-88 (letter). In that letter, the USFWS made several recommendations "[t]o avoid and/or minimize impacts to fish and wildlife resources," requested the biological assessment of the red-cockaded woodpecker, and requested the project "be held in abeyance until the above-described concerns have been adequately addressed and the requested [biological assessment] is completed and reviewed by the Service." AR at 487-88. However, in *three subsequent letters* following Horry County's response to the agencies' (including the USFWS's) and public's concerns and submission of the biological assessment, the USFWS unambiguously stated, "***Based on the information provided, the Service concurs with your [the Corps'] determination that the above-referenced project is not likely to adversely affect resources under the jurisdiction of the Service that are currently protected by the ESA [Endangered Species Act], including the RCW [red-cockaded woodpecker]. Therefore, the requirements of section 7 of the ESA have been fulfilled relative to the proposed action, and no further consultation is necessary at this time.***" EA at 520-22, 889-90, 1276-77.

Pls.' Mem. at 6.  At the hearing, the Court asked Plaintiffs and the Federal Defendants to elaborate on

an issue relating to both mitigation and one of the ten intensity factors set forth in 40 C.F.R.

§ 1508.27(b): "[t]he degree to which the effects on the quality of the human environment are likely to

be highly controversial."[17]  40 C.F.R. § 1508.27(b)(4); *see supra* at footnote ten of this Order (quoting

the ten intensity factors).  The EA indicates that after the public comment period ended, the USFWS

and NMFS, as well as the SCDNR, still had concerns with Horry County's revised compensatory

mitigation plan for Bass Lake Tract III.[18]  EA at 77-82.  These "commenting agencies specifically stated

that the number of mitigation credits required for the proposed impacts have been underestimated,"

expressed concerns that Horry County's proposed mitigation "is not located within the affected

watershed to the maximum extent possible,"[19] and disagreed with the priority category—"primary"

---

[17]     The Court also requested the Federal Defendants to provide a list of citations supporting their position that the requirement of compensatory mitigation "is reserved to the Corps."  ECF No. 47 at 1.  Following the hearing, both the Federal Defendants and Plaintiffs provided a list of supplemental citations, which the Court has thoroughly considered and reviewed.  *See* ECF Nos. 47 & 48.

[18]     In its initial comment letter, the USFWS expressed concern with the amount of compensatory mitigation credits.  AR at 488.  Similarly, the NMFS commented that the mitigation of Bass Lake "Tract III may generate preservation credit to be used towards offsetting the loss of wetlands but does not adequately compensate for those losses by itself," AR at 703, and the SCDNR stated in its final comment that "we continue to recommend that a Priority Category of Primary be used for all impact areas.  We recommend the required mitigation calculations be revised accordingly."  AR at 783.

[19]     The Coastal Conservation League likewise expressed concern with the fact that the mitigation would occur in a different watershed, *see* EA at 80, and Plaintiffs reiterate this argument in support of their position regarding the likelihood of irreparable harm.  *See* Pls.' Reply at 24-25 ("[T]he 'mitigation' is occurring outside of the impacted watershed in Georgetown County and cannot possibly offset impacts to wetlands within LOB and the project area.").  Additionally, in their complaint, Plaintiffs allege, "The Corps erred by failing to consider the objections of sister agencies and the public.  *See* 33 C.F.R. § 332.8(b)(2), (4)."  Compl. at ¶ 77.

The EPA and the Corps have jointly developed regulations addressing compensatory mitigation for the loss of aquatic resources.  *See* 33 C.F.R. § 332.3(a)(1) ("The fundamental objective of compensatory mitigation is to offset environmental losses resulting from unavoidable impacts to waters of the United States authorized by DA [Department of the Army] permits.  The district engineer must determine the compensatory mitigation to be required in a DA permit, based on what is practicable and capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity.  When evaluating compensatory mitigation options, the district engineer will consider what would be environmentally preferable.  In making this determination, the district engineer must assess the likelihood for ecological success and sustainability, *the location of the compensation site relative to the impact site and their significance within the watershed*, and the costs of the compensatory mitigation project."

versus "tertiary"[20]—used to calculate the required compensatory mitigation.  *Id.*  At first blush, the agencies' concerns may seem to implicate the "highly controversial" intensity factor set forth in 40 C.F.R. § 1508.27(b)(4).  However, although the agencies disagreed with the mitigation calculations, the Corps, as discussed in more detail above, conducted an onsite assessment of the wetlands and followed its own SOP to calculate the functionality, priority categories, and mitigation credits for the wetlands. EA at 79-80.  Additionally, it is significant to note that *none* of the three agencies outright opposed Horry County's permit application or even asked that an EIS be performed.  *Contra Friends of Back Bay*, 681 F.3d at 590 (finding a project's environmental impact was highly controversial because "no fewer than four respected governmental entities (including two of the Corps's sister agencies of the federal government) unanimously opposed the permit application as proposed," and because "[t]he FWS specifically recommended preparation of an EIS as an alternative to denying the permit").  Even when other agencies disagree as to whether an EIS should be performed, such disagreement alone is insufficient to require an EIS.  *See Roanoke River*, 940 F.2d at 64 ("[T]wo federal agencies, the Fish and Wildlife Service and the National Marine Fisheries Service, believed that the [environmental impact] is sufficiently uncertain that an EIS should be conducted.  Appellants argue that the fact that disinterested federal agencies request an EIS is proof that the effect is 'controversial,' so that the Corps abused its discretion in refusing to commission an EIS.  However, the existence of a disagreement as

---

(emphasis added)); 40 C.F.R. § 230.93(a)(1) (same); 33 C.F.R. § 332.8(b) (requiring the district engineer to "give full consideration to any timely comments and advice of the" Interagency Review Team, which may include federal and state agencies such as the USFWS, NMFS, and SCDNR; 40 C.F.R. § 230.98(b) (same).

[20]    The "primary" priority category requires a factor of 2.0 for mitigation credit calculation, whereas the "tertiary" category requires a factor of 0.5.  EA at 78.  In accordance with the Charleston District Mitigation SOP, the Corps determined that the "primary" category would be used for mitigation calculations associated with impacts to wetlands located within the LOBHP and that the "tertiary" category would be used for the remaining wetlands not located within the LOBHP.  EA at 79.

to whether an EIS should be commissioned is not by itself grounds for a court to require an EIS. *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir. 1973). *The Corps of Engineers should consider the comments of other agencies, but it need not defer to them when it disagrees*." (emphasis added)). Here, there was not even a request by the Corps' sister agencies for an EIS, and their disagreement was limited to the Corps' conclusions regarding mitigation calculations and credits.

In summary, the EA shows the Corps examined the practicability of alternatives, considered environmental impacts on water, wetlands, and wildlife, evaluated proposed mitigation, and considered comments and responses of other agencies and the public. *See Nat'l Audubon*, 422 F.3d at 185 ("[A] 'hard look' . . . encompasses a thorough investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail."). Accordingly, at this stage of litigation and for the limited purpose of ruling on Plaintiffs' preliminary injunction motion, the Court finds that the Corps took a sufficient hard look at the project's environmental impact and that its decision not to prepare an EIS was reasonable and warrants deference.

Moreover, the Court finds the Corps' preparation of the EA and issuance of the FONSI and its decision not to prepare an EIS were not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See also Pub. Citizen*, 541 U.S. at 763; *Hodges*, 300 F.3d at 445.

2.    **The Corps' Issuance of the Section 404 Permit Was Not Arbitrary and Capricious**

Plaintiffs next argue the Federal Defendants failed to properly assess this project under section 404(b) of the CWA, and that such failure constitutes an arbitrary and capricious agency decision in violation of the APA. Pls.' Mem. at 6, 22-31. Plaintiffs contend the Corps' 404(b)(1) analysis is flawed

because there are practicable alternatives to the project and such alternatives are presumed where special aquatic habitats will be impacted in the wetlands affected by the road.  *Id.* at 23-31.

### a.    Practicable Alternatives Analysis

The 404(b)(1) Guidelines of the CWA provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  40 C.F.R. § 230.10(a).  This requirement is commonly known as identifying the "least environmentally damaging practicable alternative."  *See Hoosier Envtl. Council*, 722 F.3d at 1061 ("The duty of the Corps is 'to determine the feasibility of the least environmentally damaging alternatives that serve the basic project purpose.'" (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1188 (10th Cir. 2002))).  A practicable alternative is one that "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).  When a project "is not 'water dependent,'" a presumption arises that there are "practicable alternatives [available] that do not involve special aquatic sites" and that "have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise."  *Id.* § 230.10(a)(3); 40 C.F.R. § 230.5.  A Section 404 applicant must rebut this presumption if an alternative involving the destruction of United States waters is chosen.  *See id.* § 230.10(a)(3); Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85,336, 85,339 (Dec. 24, 1980).  The parties do not dispute that the International Drive project is not water dependent, *see* EA at 4, so the rebuttable presumption of § 230.10(a)(3) applies in this case.

The Corps determined that the project is not water dependent and that the wetlands at issue, as well as the LOBHP, qualify as special aquatic sites.  EA at 4, 86, 96-97; *see* 40 C.F.R. §§ 230.3(m),

28

230.41.  Because the project is not water dependent, Horry County was required under the CWA to clearly rebut the presumption that a less environmentally damaging practicable alternative to the project exists.  *See* 40 C.F.R. § 230.10(a)(3).  Consequently, if Plaintiffs can establish Horry County did not clearly rebut this presumption but the Corps nonetheless issued the Section 404 permit, Plaintiffs can prove the Corps acted arbitrarily and capriciously, or otherwise not in accordance with law.  *See* 5 U.S.C. § 706(2)(A).

Plaintiffs assert the Corps concluded "[w]ithout any explanation or rationale" that "'expanding and improving the road cannot occur without impacting special aquatic sites (*i.e.*, wetlands)' and that 'a practicable alternative that does not involve any impacts to special aquatic sites is not available.'"  Pls.' Mem. at 26 (quoting EA at 86).  Plaintiffs contend the Corps' conclusion is directly contrary to 40 C.F.R. § 230.10(a)(3).  *Id.*  The Court disagrees, and for purposes of ruling on Plaintiffs' motion, finds otherwise.

In the EA, the Corps defined the overall project purpose as follows:

> The purpose of the re-alignment/paving/expansion of International Drive is to relieve current and anticipated congestion for local/transient commuters within the Carolina Forest Community, to provide a secondary evacuation route for the residents of the Carolina Forest Community, and to provide a direct link between S.C. 90, S.C. 31 and Carolina Forest Boulevard.  In addition to servicing the residents of the Carolina Forest Community, the proposed re-alignment/paving will provide an additional option to residents/commuters within the Myrtle Beach Community, as well as a large workforce along the Highway 90 corridor, through its direct connectivity to Robert M. Grissom Parkway.

EA at 4, 84-85.  In reaching this definition, the Corps stated it "independently reviewed the Grand

29

Strand Area Transportation Study[21] . . . as well as other information provided by" Horry County.  EA

at 4, 84.  The Transportation Study evaluated traffic patterns and projected future traffic volumes for

the Horry County area.[22]  *See* AR at 919-46, 947-1084.  The Court finds the Corps articulated a rational

---

[21]    The Grand Strand Area Transportation Study was formed in 1985 to provide a forum for the coordination of regional transportation efforts affecting northeastern coastal South Carolina. AR at 987.  It analyzes the existing and future traffic based on the historic and projected growth in the area and provides the projected impacts of changes to the road network on the capacity of primary routes located in the metropolitan area as required by the Federal government.  AR at 948.

[22]    Steve Gosnell, P.E., who is the Assistant County Administrator and County Engineer for Horry County, submitted the Grand Strand Area Transportation Study ("GSATS") in response to the Corps' request for additional information regarding the purpose and need for the International Drive project.  AR at 919.  He explained:

> The need to improve this road to a paved four-lane facility is primarily driven by the County's unprecedented growth.  Horry County's permanent population was 196,629 in 2000 and has grown to 294,596 in 2015.  Much of this growth has occurred in the Carolina Forest area which grew by a factor of six (506%) from 2000 to 2010 adding 17,000 new residents . . . .  This area of growth is served with only two (2) points of access[:] U.S. Hwy. 501 and S.C. Hwy. 31 / Grissom Parkway.  The U.S. Hwy. 501 connection is the only access that provides routes to the west. . . .  The explosive population growth and resulting traffic congestion in the vicinity of International Drive, Carolina Forest, and Highway 90 further justifies the need for the paved road connection[.] . . .  The need for a multi-lane roadway is obvious now at the east end of the project near the schools (near River Oaks Drive) where traffic congestion is a twice a day occurrence . . . .

AR at 920, 923-24.  He further explained:

> Upon review of the area, the only location that made sense due to the environmental restrictions, geographic constraints and available property was International Drive.  This dirt road has existed for well over 100 years and provides a link between S.C. Hwy. 90 and U.S. Hwy. 17 at a location approximately halfway between U.S. Hwy. 501 and S.C. Hwy. 22.  After identifying this as the only viable route that would address the growing traffic demands and the need for an alternate inland evacuation route (in the event of hurricanes, forest fires, etc) for the rapidly growing Carolina Forest area, we requested the Waccamaw Council of Governments, who administers the Grand Strand Area Transportation Study (GSATS) funds provided by the Federal government, to include the improvement of International Drive in the traffic model to determine if the benefit would justify the cost of improving this road and if it would justify the need.

AR at 921.  Mr. Gosnell further noted that the Horry County landfill is also located on Highway 90 (which will connect to International Drive's northern terminus), and that "[o]nce International Drive is improved, a significant number of waste hauling trucks will utilize the new route." AR at 921.  He explained "the GSATS (Grand Strand Area Transportation Study) travel demand network model was used to forecast the amount of traffic that would use the new roadway." AR at 924.  He summarized the findings from the traffic model with the improvement of International Drive as follows: (1) "Year 2030 projected average daily traffic (ADT) on International Drive is

basis for the overall project purpose based upon its independent consideration of the information supplied by Horry County.

After defining the overall project purpose, the Corps determined it was not water-dependent and found Horry County "has met its burden to clearly demonstrate that practicable alternatives that do not involve impacts to special aquatic site[s] do not exist," and that the County's "proposed alternative is considered the least environmentally damaging practicable alternative." EA at 4, 84-92. In reaching these conclusions, the Corps noted that it requested Horry County to clearly demonstrate in writing that there were no practicable alternatives that would fulfill the overall project purpose, that it conducted several meetings with the County to discuss concerns relating to the alternatives analysis, and that it required additional information from the County during those meetings. EA at 72-73. The Corps considered eleven proposed alternatives (as well as a no action alternative) and concluded none were practicable alternatives within the meaning of 40 C.F.R. § 230.10(a)(3). In concluding the proposed route for International Drive was the least environmentally damaging practicable alternative, the Corps

---

expected to range from approximately 10,000 to 13,500 vehicles per day"; (2) "Projected ADTs for International Drive are close to or over the 10,800 capacity for a two-lane minor arterial as per SCDOT's Travel Demand Model Total Capacity Table"; and (3) "Even with the paved connection to Hwy 90 via International Drive, other area roadways, such as US Highway 501, will still be over capacity in 2035 despite the additional widening improvements (programmed for 2018) that are included in the model run." AR at 922-23. Mr. Gosnell concluded:

> [I]t is unreasonable to design and permit International Drive as an unsafe two-lane roadway that will reach a borderline Level of Service (LOS) that is expected to be close to capacity within the next 15 years. If the road is built with a two-lane cross-section, the [C]ounty will likely need to submit another permit application for additional wetland impacts to widen the roadway in the very near future.
>
> In summary, alternate routes for regular commuter traffic to and from Conway will still be necessary, and alternate inland evacuation routes from the developed area of Carolina Forest will still be needed with or without any improvements to US Highway 501. This need will be fulfilled by the construction of International Drive, and not by the no-build or two-lane alternative for International Drive.

AR at 925. Mr. Gosnell's explanations and submission of the GSATS clearly show the explosive population growth in the area and the need for the road.

found:

>    The proposed route is the only alternative that clearly meets
>    the project purpose and need while providing the least environmental
>    impacts to the surrounding resources.  Furthermore, the proposed
>    route provides the least damaging impacts to adjacent landowners and
>    potential residences.  The benefits associated with the preferred
>    alternative include:
>    - Existing road infrastructure minimizing wetland
>      impacts to 24.19 in comparison to 35 acres.
>    - Improvements to fragmented wetlands lacking cross-
>      drainage along proposed/existing alignment.
>    - Avoidance of a minority community.
>    - Avoidance of existing Red-cockaded Woodpeckers
>      clusters and foraging habitat within Lewis Ocean Bay
>      Heritage Preserve.
>    - Avoidance of further fragmentation of wetlands in a
>      nearly undisturbed wetland ecosystem.
>
>    As demonstrated by the applicant, the proposed route impacts
>    the least amount of WOUS [waters of the United States] while
>    meeting the applicant's purpose and adequately addressing their need.

EA at 91-92.

Although Plaintiffs claim at least three alternatives would not involve impacts to special aquatic

sites—(1) improvements to U.S. Highway 501, (2) improvements to River Oaks Drive and Carolina

Forest Boulevard, and (3) the no action alternative—the Corps determined these alternatives would not

satisfy the needs for the International Drive Project.  EA at 89-92.  The Corps performed its alternatives

analysis by documenting and discussing the environment impacts, as well as the relative benefits and

detriments, of each proposed alternative.  *See id.*

Additionally, Plaintiffs make an argument relating to both the Corps' alternatives analysis and

the Corps' cumulative impact analysis.  *See* Pls.' Mem. at 27-29; Pls.' Reply at 10-18.  They point out

the Section 404 permit authorizes ten curb cuts along the west (private) side of the road, and they assert

32

the Corps' failure to consider future land use maps "depicting significant swaths of land west of International Drive slated for development" is arbitrary and capricious. *Id.* (citing AR at 967-68).

In determining whether a proposed project will have a significant impact on the environment, the Corps must consider (among other intensity factors, *see supra* at footnote ten of this Order) the reasonably anticipated "cumulatively significant impacts" of a proposed project. *See* 40 C.F.R. § 1508.27(b)(7). Cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "An EA may be deficient if it fails to include a cumulative impact analysis." *Ohio Valley Envtl. Coal. v. Hurst*, 604 F. Supp. 2d 860, 883-84 (S.D.W. Va. 2009) (citation omitted).

In this case, the Corps included a substantive cumulative impact analysis in the EA. *See* EA at 73-74. The Corps determined the curb cuts were needed for access to "upland areas scattered throughout" private properties adjacent to International Drive. EA at 73. The Corps opined the potential for development was limited given the abundance of wetlands in the project vicinity, explaining that "[d]ue to the expansive amount of wetlands on both sides of the proposed road, the amount of developable land is limited" and that "[d]ue to the limits and distribution of wetlands adjacent to the proposed route, future development will be limited due to lack of developable land in addition to large contiguous wetlands requiring substantial road infrastructure." EA at 73-74. Importantly, the Corps recognized that "future developmental projects requiring Federal authorization, if submitted, will require a thorough review and will be considered at that time." EA at 74. Given the Corps' rational analysis, the Court cannot conclude for the purpose of Plaintiffs' preliminary injunction

33

motion that the Corps' cumulative impact analysis was deficient or otherwise flawed.

### b.     Special Aquatic Sites

The Corps noted in the EA that the construction project will directly impact over twenty-four acres of wetlands, and that a portion of the project is located within the LOBHP, a state wildlife preserve managed by the SCDNR. EA at 96-97. Both the wetlands and the LOBHP are classified as "special aquatic sites." EA at 96; *see* 40 C.F.R. §§ 230.40 (state sanctuaries and refuges), 230.41 (wetlands).

As mentioned above, the 404(b)(1) Guidelines of the CWA provide that the permitting authority should "[e]xamine practicable alternatives to the proposed discharge, that is, not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences (§ 230.10(a))." 40 C.F.R. § 230.5(c). Even if no alternatives are available, no discharge of dredged or fill material is permitted if it will "will cause or contribute to significant degradation of the waters of the United States." *Id.* § 230.10(c). Significant degradation encompasses "significantly adverse effects" on special aquatic sites, fish, wildlife, and other enumerated aquatic ecological values. *Id.* § 230.10(c). The 404(b)(1) Guidelines provide that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Id.* § 230.10(d).

Plaintiffs argue the Corps violated 40 C.F.R. § 230.10 of the 404(b)(1) Guidelines by authorizing the fill of over twenty-four acres of freshwater wetlands—which are special aquatic sites—including those associated with the LOBHP. Pls.' Mem. at 29-31. Plaintiffs assert, "The fill of this large amount of wetlands will impair the hydrology of those connected wetlands. This will result in a permanent alteration of the aquatic ecosystem in the vicinity of the project, impairing its functions

and values." *Id.* at 30.

As mentioned earlier, the USFWS initially expressed concerns with the project but ultimately concurred with the Corps' determination that the project was not likely to adversely affect resources (such as the red-cockaded woodpecker) under the USFWS's jurisdiction and protected by the Endangered Species Act. AR at 521-22. Additionally, the Corps relied on the 2013 contract between Horry County and the SCDNR and found this contract mitigated any impacts that the project may have on the LOBHP. EA at 86, 96, 99. The Corps determined the environmental impacts of the discharge/fill would not be significant because the 2013 contract contains specific provisions regarding the protection and preservation of the LOBHP. EA at 96. The Corps also conditioned the Section 404 permit upon Horry County's compliance with the 2013 contract. EA at 76; AR at 1500 (the Section 404 permit). For purposes of Plaintiffs' preliminary injunction motion, the Court cannot conclude it was arbitrary and capricious for the Corps to rely on the existence of a contract with a state wildlife agency responsible for the management of wetlands, wildlife, and habitat contained in the LOBHP.

Moreover, the Corps acknowledged that while the project will directly impact approximately twenty-four acres of wetlands, which "is recognized to be significant when considering acreage alone," these wetlands "are mostly considered impaired with limited function (approximately 2/3 has [*sic*] been identified as impaired)" and therefore "the impacts are not considered significant." EA at 96-97. Separately, the Corps determined no other types of special aquatic sites (mud flats, vegetated shallows, coral reefs, and riffle and pool complexes, *see* 40 C.F.R. §§ 230.42, 230.43, 230.44, 230.45) are located within the project area. EA at 97. The Corps substantively applied the 404(b)(1) Guidelines, including those in § 230.10(c), and determined the "activity will not cause or contribute to significant degradation of waters of the United States." EA at 97-102. Based upon the Corps' reasoned analysis, the Court

35

cannot conclude the Corps misapplied the 404(b)(1) Guidelines.

In conclusion, the Court finds the Corps did not act arbitrarily or capriciously in analyzing the project under section 404(b) of the CWA and determining Horry County clearly demonstrated a lack of practicable alternatives that do not involve special aquatic sites. *See* 40 C.F.R. § 230.10(a)(3). The Court has made a searching and careful inquiry into the facts and the record, and it finds the Corps' decision was based on consideration of the relevant factors and does not constitute a clear error of judgment. *See Marsh*, 490 U.S. at 378; *Hodges*, 300 F.3d at 445. Accordingly, at this stage of litigation and for purposes of Plaintiffs' preliminary injunction motion, the Court finds the Corps' actions were not arbitrary, capricious, or otherwise erroneous. *See* 5 U.S.C. § 706(2)(A); *Roanoke River*, 940 F.2d at 61 ("[Judicial] review . . . is limited to a determination of whether the Corps' decision was 'arbitrary, capricious, otherwise not in accordance with law, or unsupported by substantial evidence.'" (quoting 5 U.S.C. § 706(2))).

### 3.     Plaintiffs Have Not Clearly Shown a Likelihood of Success on the Merits

The Court finds Plaintiffs have not, for purposes of their preliminary injunction motion, made a clear showing that they are likely to succeed on the merits of their claims that the Corps failed to comply with NEPA and the CWA. Thus, Plaintiffs have not met a requirement—a clear showing of their likelihood to succeed on the merits—necessary to receive preliminary injunctive relief.

In so concluding, the Court takes note that the Administrative Record in this matter is over 1500 pages and the EA is 133 pages. This is not a situation where the Corps took a cursory look or had limited involvement. The Corps has further indicated that under its SOP for the Charleston District, Horry County's revised compensatory mitigation plan satisfies the Corps' calculation of mitigation credits, despite other agencies' disagreement. The Corps is recognized for its expertise and surely is

36

aware of and knows how to interpret and apply its own SOP, and the law requires deference to that expertise even if Plaintiffs or other agencies disagree. *See Aracoma Coal*, 556 F.3d at 192 ("Especially in matters involving not just simple findings of fact but complex predictions based on special expertise, a reviewing court must generally be at its most deferential. . . .  Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency.'" (internal quotation marks omitted)).  This is what the Corps does, and the Corps does it regularly.  The Corps has no reason not to follow its own SOP regarding the calculation of mitigation credits and the categorization of wetland functionality and priority.

Aside from the disagreement among wildlife agencies and the Corps over its mitigation calculations, the Court is cognizant of the elimination of the wildlife passages (bear tunnels/underpasses) from the contract between the SCDNR and Horry County.  Notably, the Corps discussed the elimination of the passages and high fencing along the roadway.  EA at 75-76.  Certainly the County is saving money and construction costs by eliminating this contractual obligation, but at the same time the SCDNR is the state agency charged with the protection of wildlife and natural resources in this state.  The Corps thoroughly discussed the wildlife crossings, and it believed the modified 2013 contract "represents an optimal balance between measurable benefits and risks (e.g., bears getting trapped in the right of way)."  EA at 76.  Throughout the EA, the Corps summarized the numerous comments received as well as the responses Horry County provided, and the Corps carefully considered the concerns raised in the comments.  The Court is not in a position to substitute its judgment for that of the Corps, as the Corps' decision is not arbitrary and capricious but rather a reasoned decision.

Having concluded Plaintiffs have not clearly shown a likelihood of success on the merits, the

Court could stop its analysis here. However, for the sake of a full and clear record, the Court will briefly discuss the remaining three *Winter* elements. *See Real Truth*, 575 F.3d at 347 (recognizing "*Winter* articulates *four requirements, each of which must be satisfied* as articulated" (emphasis added)).

### B.    Likelihood of Irreparable Harm

The second *Winter* factor requires Plaintiffs to demonstrate irreparable harm will occur absent an injunction. *See* 555 U.S. at 20. Plaintiffs allege in their complaint that they regularly use and enjoy the waters, wetlands, bears, birds, and other natural resources of the LOBHP, which will be degraded and/or destroyed if the project is allowed to proceed as planned. Pls.' Compl. at ¶¶ 6-9. Plaintiffs argue filling over twenty-four acres of wetlands and impacting nearly twenty acres of the LOBHP constitute irreparable harm. Pls.' Mem. at 31-36. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). For the purpose of Plaintiffs' motion, the Court will assume Plaintiffs have met their burden of demonstrating irreparable injury will result if a preliminary injunction is not issued.[23]

### C.    Balance of the Equities and the Public Interest

The balance of the equities and the public interest are the third and fourth factors to be considered. Plaintiff must show the balance of the equities tip in their favor and that preliminary injunctive relief is in the public interest. *See Winter*, 555 U.S. at 20. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding

---

[23]    While the Federal Defendants and Horry County argue the likelihood of irreparable harm is minimal because much of the wetlands are impaired or partially impaired and of limited function, *see* Fed. Defs.' Mem. at 33 & Horry Cty.'s Mem. at 14-15, the Corps determined there were five undisturbed and fully functional wetlands in the project right of way. EA at 2. Thus, the Court cannot ignore the likelihood of irreparable harm to, at the very least, those five wetlands.

of the requested relief." *Id.* at 24.

> For several decades the [Supreme] Court has held that violations of
> federal statutes can be enjoined only if an injunction is supported by
> the balance of equities, a test also known as the "balance of
> hardships," the "balance of interests," and the "balance of
> conveniences."  When courts balance the equities, they compare the
> hardship the plaintiff would face if an injunction were denied against
> the hardship the defendant would face if an injunction were granted.

Jared A. Goldstein, *Equitable Balancing in the Age of Statutes*, 96 Va. L. Rev. 485, 487 (2010) (internal

footnotes omitted).  The Supreme Court "suggested" in *Winter* that harm to the environment *itself*

"could not be considered in the balance of equities.  Instead, harm to the [environment] mattered only

to the extent that it harmed the plaintiffs, because the balance of equities takes into account injuries to

the parties, not to the environment."[24]  *Id.* at 513-14 (citing *Winter*, 555 U.S. at 25-26).

　　　Plaintiffs allege, regarding the balance of the equities, that the potential harm to them is

---

[24]　　　The Supreme Court in *Winter* cited its earlier holding in *Amoco Production Co. v. Village of Gambell*, 480
U.S. 531 (1987), stating "courts 'must balance the competing claims of injury and must consider the effect on each
party of the granting or withholding of the requested relief.'"  555 U.S. at 24 (quoting *Amoco*, 480 U.S. at 542).  In
*Amoco*, the Supreme Court focused on the harm to the plaintiffs—adverse effects of exploratory oil drilling on
Alaskan Native Americans' aboriginal rights to hunt and fish—and concluded such "injury to subsistence resources
from exploration was not at all probable."  480 U.S. at 535, 545.  Likewise, in *Winter*, the Supreme Court focused
on the harm to the plaintiffs:

> The plaintiffs presented evidence that some whales (the exact number was disputed,
> as was the extent of the harm) would be harmed by the sonar [during naval training
> exercises].  The Supreme Court suggested, however, that harm to the whales could
> not be considered in the balance of equities.  Instead, ***harm to the whales mattered
> only to the extent that it harmed the plaintiffs***, because the balance of equities
> takes into account injuries to the parties, not to the environment.  Thus, for harm to
> whales to carry any weight in the balance of equities, the plaintiffs would have to
> show that the sonar would harm enough whales that the plaintiffs' opportunities to
> go whale watching and make nature documentaries would be diminished.
> Moreover, the Court declared, even if the plaintiffs could show that the use of the
> sonar would result in diminished opportunities to go whale watching and make
> nature documentaries, that injury would pale in comparison to the interests on the
> other side of the balance of equities, the Navy's interest in training sailors, which
> the Court credited as essential to national security.

Goldstein, 96 Va. L. Rev. at 513-14 (internal footnotes omitted) (emphasis added) (citing *Winter*, 555 U.S. at 13-14,
24-26).

significant because the loss of twenty-four acres of wetlands and the loss of a portion of LOBHP would

be permanent and irreparable once that acreage is filled in and paved over.  Pls.' Mem. at 37.  The

County, meanwhile, argues it will suffer harm in both financial and non-monetary forms (specifically,

commitments to construction costs, public safety risks, and traffic congestion).  Horry Cty.'s Mem. at

17-19.

It is undeniable that the construction of International Drive will result in the destruction of a

small portion of wetlands in the LOBHP.  The most serious possible injury is the net loss of 24.19 total

acres of freshwater wetlands—of which approximately two-thirds are already impaired or partially

impaired—and impacts to 19.48 acres of LOBHP (7.07 acres of freshwater wetlands and 12.41 acres

of uplands).  *See* EA at 96, 99.  However, such a loss is minimal when compared to the fact that the

LOBHP acreage being impacted is located on the very edge of the LOBHP boundary, that the LOBHP

consists of more than 10,000 acres, that Horry County is installing culverts underneath the road to

restore hydrology in the area, and that the County must abide by the terms of its 2013 contract with the

SCDNR that requires the County to take specific measures to ensure the protection and preservation

of wildlife in the LOBHP.  Destruction of the wetlands matters only to the extent it will harm Plaintiffs

because the balance of the equities takes into account injuries to the parties, not to the environment.

*See Winter*, 555 U.S. at 24 ("[C]ourts 'must balance the competing claims of injury and must consider

the effect on each party of the granting or withholding of the requested relief.'" (quoting *Amoco*, 480

U.S. at 542)).  In other words, for the harm to wetlands to carry any weight in the balance of the

equities, Plaintiffs must demonstrate destruction of the wetlands would be of such a magnitude as to

impair their ability to regularly use and enjoy the natural resources of the LOBHP.

There will always be at least some concern regarding the potential for negative environmental

impacts anytime man places his footprint in the environment.  Regarding the International Drive project, there is already an existing dirt road in the project area.  The Corps, with its undeniable expertise in assessing wetland functionality, has determined approximately two-thirds of the wetlands to be filled are already impaired or partially impaired "with limited function."  EA at 2, 97.  A state administrative law court found the existing dirt road has caused fragmentation of the wetlands in the area, and noted the project plan calls for multiple culverts underneath the paved road that would actually aid in reconnecting already fragmented wetlands and thereby restore their hydrologic function.  AR at 1327. Morever, the 2013 contract between the SCDNR and Horry County requires several conditions to be met regarding the preservation of the LOBHP.  The Court cannot ignore the fact that the SCDNR, a state agency charged with the protection of South Carolina's natural resources, is satisfied with the conditions and minimization measures required of the County.  The County's "interests must be weighed against the possible harm to the ecological, scientific, and recreational interests that are legitimately before this Court."  *Winter*, 555 U.S. at 25.  The costs associated with the delay in construction are a small but still important consideration.  However, the Court notes Horry County chose to begin construction of the road, and Plaintiffs' lawsuit seeking an injunction really should have been no surprise to the County.[25]  The County's argument that there was some unusual delay by

---

[25]     The County decided to commence construction explicitly acknowledging the risk of this federal action. After the Section 404 permit was issued, Horry County Chairman Mark Lazarus made the following statement in a press release:

> There are always risks, but this is certainly an acceptable risk we are willing [to] take[.] . . .  We now have all the permits in our possession that allow[] us to begin construction on this road.  There is the potential that a federal court action could be filed to stop us from paving the road, but again we are willing to take that risk.  We have the money in the bank and all the required permits for this project, and we are going to get this road built.

ECF No. 16-1 at 3 (internal quotation marks omitted).  This statement appears to have been made in August 2016, and this lawsuit seeking an injunction was commenced on September 1, 2016.

        Additionally, the Court notes Plaintiffs did not become aware of the Corps' issuance of the Section 404 permit until August 22, 2016, when the press release was disseminated by Horry County via email.  ECF No. 16 at

Plaintiffs in seeking an injunction does not carry water with this Court. However, the traffic congestion and public safety concerns are both major and important considerations when balancing the parties' competing claims of injury. Here, the Court finds the balance of the equities tips in favor of Horry County in light of the traffic congestion issues and public safety concerns.[26]

The final *Winter* factor requires Plaintiffs to show a preliminary injunction is in the public interest. Plaintiffs assert the public interest favors (1) the preservation of the wetlands in the LOBHP, which is a public land trust intended for the enjoyment of all citizens, and (2) the enforcement of NEPA. Pls.' Mem. at 39-42. However, the Federal Defendants and Horry County contend there is an overwhelming immediate public need for International Drive because its purpose is to create an alternate route for evacuation and emergency responders and to relieve significant traffic congestion in the area. Fed. Defs.' Mem. at 34-36; Horry Cty.'s Mem. at 19-21.

In evaluating the public interest factor, a court "should pay particular regard for the public consequences" of granting an injunction. *Winter*, 555 U.S. at 24; *see Real Truth*, 575 F.3d at 347 ("[I]n *Winter*, the Supreme Court emphasized the public interest requirement . . . ."). Here, both parties raise important public policy concerns: environmental preservation by Plaintiffs and public safety by Defendants. Horry County, in particular, makes a persuasive argument regarding the immediate need for the road to improve safety and reduce congestion.[27] *See, e.g.*, *Rio Associates, L.P. v. Layne*, No. 3:15-CV-00012, 2015 WL 3546647, at *6 (W.D. Va. June 8, 2015) (finding the plaintiffs "failed to establish by a clear showing that . . . the public interest favors granting injunctive relief" in light of the

---

2. Plaintiffs represent that they filed a Freedom of Information Act request to the Corps, and received a partial response including the Section 404 permit and the EA on August 25, 2016. *Id.*

[26]    *See* Gosnell's Discussion of the Grand Strand Area Transportation Study, *supra* footnote 22.

[27]    *See* Gosnell's Discussion of the Grand Strand Area Transportation Study, *supra* footnote 22.

defendants' argument that the road construction "projects will improve the quality of life of thousands of people by reducing congestion and enhancing safety"). It is obvious "[t]he singular aspect of this case is that the parties' sharply differing views of the public interest are exactly what gave rise to the case." *Nat. Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 983 (4th Cir. 1992) (alteration in original). At best, Plaintiffs' public interest showing could arguably be said to equal Defendants' public interest showing, and therefore Plaintiffs have not carried their burden on this factor. But the Court cannot ignore the need for the road and the project's purpose to relieve significant traffic congestion, provide an alternate route for emergency responders, and create an additional evacuation route. Either way, this results in Plaintiffs not meeting their burden as to this factor.

### Conclusion

For the reasons explained above, the Court finds Plaintiffs have not met their burden under the *Winter* factors and therefore **DENIES** Plaintiffs' Motion for Preliminary Injunction [ECF No. 6] because Plaintiffs have not satisfied all the requirements necessary to receive preliminary injunctive relief. The Court hereby **DISSOLVES** the consent temporary restraining order previously in effect [ECF No. 23].

**IT IS SO ORDERED.**


Florence, South Carolina                                    s/ R. Bryan Harwell
November 18, 2016                                          R. Bryan Harwell
                                                           United States District Judge

43